*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
KISOR, DALY, and MIZER
Appellate Military Judges

———————————————

**UNITED STATES**
*Appellee*

**v.**

**Austin M. CUNNINGHAM**
Sergeant (E-5), U.S. Marine Corps
*Appellant*

**No. 202200263**

———————————————

Decided: 8 May 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Glenn R. Hines (arraignment)
Nicholas S. Henry (motions and trial)

Sentence adjudged 24 August 2022 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, confinement for 21 years, forfeiture of all pay and allowances, and a dishonorable discharge.[1]

For Appellant:
*Major Jasper W. Casey, USMC*

---

[1] Appellant was credited with having served 477 days of pretrial confinement.

For Appellee:
*Major Candace G. White, USMC*
*Major Mary Claire Finnen, USMC*

Judge DALY delivered the opinion of the Court, in which Senior Judge KISOR and Judge MIZER joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

DALY, Judge:

A military judge sitting alone as a general court-martial convicted Appellant, pursuant to his pleas, of one specification each of viewing, possessing, producing, and distributing child pornography, in violation of Article 134, Uniform Code of Military Justice [UCMJ],[2] one specification of rape of a child, and one specification of sexual abuse of a child, both in violation of Article 120b, UCMJ.[3]

Appellant asserts one assignment of error (AOE), which he preserved for appellate review by entering conditional pleas of guilty:[4] whether the military judge abused his discretion by admitting evidence obtained in violation of *Miranda v. Arizona*[5] and Article 31(b), UCMJ.[6] We find no prejudicial error and affirm.

---

[2] 10 U.S.C. § 934.

[3] 10 U.S.C. § 920b.

[4] R.C.M. 910(a)(2).

[5] 384 U.S. 436 (1966).

[6] 10 U.S.C. § 831(b).

# I. BACKGROUND

## A. Federal Civilian Warrant to Search and Seize Appellant's Electronic Devices

In April 2021, the North Carolina Internet Crimes Against Children [ICAC] Task Force—consisting of federal, state, and local law enforcement, including Homeland Security Investigations (HSI), North Carolina State Bureau of Investigations, and the Boone Police Department (PD)—investigated sexual exploitation of children via the social media platform, Kik Messenger. Appellant engaged in a private message conversation with an undercover Boone PD detective who served as a Task Force Officer. Ultimately, Appellant distributed videos containing child pornography to the detective.[7] The private message conversations were recorded, and all images and videos Appellant sent were downloaded and preserved as evidence. Subsequently, the detective gathered enough information to identify Appellant as a Marine living on Marine Corps Base Camp Lejeune [Camp Lejeune].

A federal magistrate judge approved HSI Special Agent Baker's application for a federal warrant to search Appellant's house on Camp Lejeune. The warrant authorized a search of Appellant's on base residence and seizure of computer hardware, computer software, passwords, documents, data security devices, and other electronic devices for evidence of child pornography.[8]

The warrant does not mention the Naval Criminal Investigative Service [NCIS].[9] However, days before the federal magistrate judge approved it, an HSI supervisor coordinated with the local NCIS supervisory special agent. The HSI supervisor informed the NCIS supervisory agent that the Task Force would be operating on Camp Lejeune and requested background information on Appellant.[10] Specifically, the HSI agents wanted NCIS to verify Appellant was an active-duty Marine, verify his address on Camp Lejeune, and obtain photos of the house for the warrant application. Further, HSI agents requested that NCIS have an NCIS polygrapher available on base the day of the search, in case Appellant consented to a polygraph.[11] Special Agent Baker testified that this coordination, including the use of a local polygrapher, is standard practice; and when he applied for, and executed, the search warrant, the intent

---

[7] Pros. Ex 1.

[8] App. Ex. LII at 43-44.

[9] App. Ex. LII at 1-69; App. Ex. LXXXVI at 10.

[10] R. at 361.

[11] R. at 361-62, 401-03.

was for the United States Attorney's Office to prosecute Appellant in federal district court.[12]

**B. Execution of Warrant and Homeland Security Investigation Agents Interrogate Appellant**

HSI agents assembled off base around 0545 the day of the search to conduct an operations brief.[13] NCIS agents were not present at the briefing as they were not intended to be involved in the actual execution of the search warrant.[14] However, three NCIS agents provided surveillance on Appellant's house from their vehicle to ensure he did not leave before the search.[15] The HSI agents entered the base using their credentials.[16]

At approximately 0615, the HSI agents entered Appellant's neighborhood with six or eight vehicles.[17] HSI Special Agents Baker and Peters—wearing body armor with police HSI markings—approached the house, knocked on the door, and announced their presence.[18] Appellant answered the door in his boxer shorts and without his eyeglasses.[19] Special Agent Baker identified himself and explained to Appellant that they had a search warrant for his house and that he needed to step outside onto the porch.[20] Once Appellant stepped outside, other HSI agents moved closer to the front door. Special Agent Baker stepped inside the threshold of the door and yelled upstairs for anyone else in the house to come down. After Appellant's fiancé and her two sons came downstairs and went outside, HSI agents entered Appellant's house and cleared it.[21]

---

[12] R. at 363.

[13] R. at 363.

[14] R. at 364.

[15] R. at 364, 380, 382-83, 404-05, 430-31, 435-36.

[16] R. at 381; Finding of Fact (i), App. Ex. LXXXVI at 2.

[17] R. at 381.

[18] R. at 364. The HSI agent explained, "Typically . . . we don't like to smash doors in and, you know, kind of do the full thing for a search execution just because we would like for the suspect to talk to us. And find that it's easier to have him talk to us if we just knock on the door, ask him to come outside and talk to us."

[19] R. at 368, 385-87, 415, 425.

[20] R. at 364.

[21] R. at 365.

Special Agent Baker explained to Appellant that the search warrant was for child pornography and that they would like to speak with him.[22] He further explained to Appellant that he was not under arrest. Neither HSI agent read Appellant *"Miranda"* warnings.[23] Special Agent Baker told Appellant if he was willing to speak, they could do so in one of their vehicles—as a matter of privacy so he did not have to stand out on his front porch and have that conversation with neighbors potentially watching.[24] Appellant agreed to speak with them in Special Agent Peters' unmarked Jeep Cherokee directly in front of his house. At some point, an unknown HSI agent retrieved Appellant's pants and shirt for him to wear.[25]

In the Jeep Cherokee, Appellant sat in the front passenger seat, Special Agent Baker sat in the driver seat, and Special Agent Peters sat in the back seat.[26] The vehicle doors remained unlocked and Appellant was "not patted down, searched, frisked, or placed in any restraints at any time prior to the questioning by HSI agents, while in the vehicle or immediately following the interview."[27]

The conversation was only partially audio recorded as Special Agent Baker neglected to turn on his audio recording device until they were two to three minutes into the conversation.[28] In the vehicle, HSI agents reintroduced themselves and generally explained the investigation that led them to search his house.[29] The recording began during Appellant's explanation of the types of social media accounts he used and what sexual content videos he sent to others.[30] Towards the end of the interview, Appellant asked for—and HSI agents retrieved from his house—his eyeglasses, cigarettes, and a bottle of Gatorade.[31]

---

[22] R. at 365.

[23] R. at 366, 388-89, 427. The HSI Agent testified it was a non-custodial interview and he did not personally deal with NCIS at all and did not know of NCIS involvement in the execution of the search warrant. Pros. Ex. 2 at 3 ("I'm telling you right now you're not under arrest right now.").

[24] R. at 365.

[25] R. at 415.

[26] R. at 366-67, 414-15.

[27] Finding of Fact (o), App. Ex. LXXXVI at 2; R. at 366-67, 414-15.

[28] R. at 367, 388.

[29] R. at 387.

[30] R. at 387; Pros. Ex. 2.

[31] R. at 385-90; Pros. Ex. 2 at 32-34.

During the 52-minute interview, Appellant: (1) admitted he was the user of account "fabiomontoya"; (2) admitted he traded child pornography; and (3) provided a list of applications and devices he used to include Dropbox, Kik Messenger, Telegram Messenger, CashApp, his Desktop Computer, and a Samsung Galaxy Note 20 Smart Phone.[32] Appellant stated he used only the Samsung Galaxy Phone and Kik Messenger to trade illicit images.[33] At the conclusion of the interview, Appellant consented to Special Agent Baker's request that he assume control of Appellant's online profiles of the above accounts, and Appellant agreed to participate in a polygraph examination with an NCIS polygrapher.[34]

NCIS agents ultimately participated in the search—albeit unplanned, only after the HSI agents began their interview with Appellant in the Jeep Cherokee. We concur with the trial judge who found, "[p]rior to agreeing to speak with HSI agents, no NCIS agent had approached the house or was involved in the search. NCIS agents were not involved in the planning of the search, and HSI agents brought enough agents to conduct the search on their own."[35] NCIS Special Agent Lee—one of the three NCIS agents who surveilled Appellant's house—spoke with Appellant's fiancé and liaised with the Department of Social Services, Child Protective Services.[36] NCIS Special Agent King—also among the agents who surveilled Appellant's house—helped search Appellant's house after it was cleared by the HSI agents, but did not find any electronic devices.[37] Both HSI and NCIS reports indicate agents from HSI and NCIS executed the federal search warrant.[38] The NCIS report lists Appellant as a subject of an investigation and refers to a "joint" investigation with HSI.[39] HSI agents had primary investigative "jurisdiction" at the time of the search until the command took "jurisdiction."[40] Again, we concur with the trial judge who found, "[a]t the time of questioning the Appellant, HSI considered the investigation 'joint' because it was working with members of the ICAC task force

---

[32] App. Ex. XLV.

[33] R. at 400; Pros. Ex. 1 at 10-11.

[34] R. at 367, 400; Pros. Ex. 1 at 11; Def. Ex. B at 3.

[35] Finding of Fact (o), App Ex. LXXXVI at 2.

[36] R. at 407-09.

[37] R. at 437-38.

[38] Pros. Ex. 1 at 10; App. Ex. LX at 1.

[39] R. at 394.

[40] R. at 400, 408-09; App. Ex. XLV, Encl. D.

that were from different jurisdictions, such as the Task Force officer who conducted the undercover communications but was not part of HSI. HSI report did not list NCIS as an agency that was part of the joint investigation."[41] Special Agent King testified that, at the time of the search, NCIS agents suspected Appellant of a criminal offense and Special Agent Lee was on the ICAC Task Force—although not participating in this case in that capacity.[42]

## C. NCIS Polygraph and Questioning

After consenting to a polygraph, Appellant went directly with the NCIS agents in their Government vehicle to the NCIS office.[43] Appellant received oral and written notice of his Article 31(b) rights, which he waived, and repeated his consent to a polygraph. NCIS agents did not administer a cleansing warning.[44] Appellant repeated the previous admissions he had made to the HSI agents.[45] Appellant additionally admitted he produced and distributed two videos involving minors engaged in sexual activities. Specifically, Appellant admitted to recording and sending videos of himself masturbating in the presence of his own four-year old son while his son slept and also performing oral sex on his fiancé's two-year-old son.[46]

## D. Procedural History

Appellant made a timely motion to suppress his statements to the HSI agents and the NCIS polygrapher, and the evidence derived from each of those statements.[47] The military judge denied the motion in a written ruling, finding that Appellant was not in custody when questioned by Special Agents Baker and Peters and that the HSI agents were not acting in furtherance of any military investigation or as an indivisible entity.[48] Thus, the HSI agents were not

---

[41] Finding of Fact (v), App. Ex. LXXXVI at 3.

[42] R. at 438-39, 441.

[43] R. at 367.

[44] Pros. Ex. 3; Def. Ex. B at 1-2; App. Ex. XLV at 12.

[45] Pros. Ex. 3 at 29-37.

[46] R. at 400; Pros. Ex. 3 at 25-26.

[47] App. Ex. XLV (Motion to Suppress dtd 23 June 2022).

[48] App. Ex. LXXXVI.

required to provide either *Miranda* warnings or Article 31(b) rights advisement.[49] And, since no rights warnings were required prior to that interview, the NCIS polygrapher was not required to provide a cleansing warning.[50]

Appellant's subsequent agreement to plead guilty was conditional; he did not waive motions "previously litigated or those otherwise non-waivable to [sic] R.C.M 705(c)(1)(B)."[51]

Additional facts necessary to resolve Appellant's AOE are discussed below.

## II. DISCUSSION

### A. Standard of Review

We "review a military judge's denial of a motion to suppress for an abuse of discretion"[52] and consider the evidence in the light most favorable to the party that prevailed at trial, in this case the Government.[53] This is a strict standard, "calling for more than a mere difference of opinion."[54] A military judge abuses his discretion when he: (1) "predicates a ruling on findings of fact that are not supported by the evidence of record . . . ;" (2) "uses incorrect legal principles;" (3) "applies correct legal principles to the facts in a way that is clearly unreasonable . . . ;" or (4) "fails to consider important facts."[55] Specifically, we review de novo any conclusions of law supporting the suppression ruling, including whether someone is in custody for purposes of *Miranda* warnings and the voluntariness of a confession.[56]

---

[49] App. Ex. LXXXVI at 9-10.

[50] App. Ex. LXXXVI at 12.

[51] App. Ex. LXXIX at 7; R. at 785.

[52] *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (citation omitted).

[53] *United States v. Mitchell*, 76 M.J. 413, 417 (C.A.A.F. 2017).

[54] *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (citation omitted).

[55] *United States v. Lattin*, 83 M.J. 192, 198 (C.A.A.F. 2023).

[56] *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019); *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009).

**B. *Miranda* warnings were not required because Appellant was not in custody.**

Appellant argues that his interview by HSI Special Agents Baker and Peters triggered his rights under *Miranda.*[57] We disagree.

The United States Constitution provides, "No person…shall be compelled in any criminal case to be a witness against himself . . . ."[58] In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[59] The Court further specified that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statements he does make may be used as evidence, against him, and that he has a right to the presence of an attorney, either retained or appointed."[60]

But an individual—at least in a non-military context—is only entitled to *Miranda* rights advisement if the individual is in custody while being interrogated.[61] Whether someone is subjected to custodial interrogation depends on whether the individual was questioned by law enforcement after being "taken into custody or otherwise deprived of his freedom of action in any significant way."[62] In evaluating whether an individual is in custody, courts look to "how a reasonable person in the suspect's situation would perceive his circumstances."[63] "The safeguards prescribed by *Miranda* become applicable as soon

---

[57] *See United States v. Tempia,* 16 C.M.A. 629, 631, 37 C.M.R. 249, 251 (C.M.A. 1967) (holding that military courts, like state courts, have the same responsibility as federal courts to protect a person from a violation of constitutional rights; and holding specifically that the principles enunciated in *Miranda* are applicable in military prosecutions).

[58] U.S. CONST. amend. V.

[59] *Miranda*, 384 U.S. at 444.

[60] *Id.*

[61] *Id.*; *see Berkemer v. McCarty*, 468 U.S. 420, 434 (1984) ("[A] person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature of or severity of the offense of which he is suspected or for which he was arrested."); *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009); *United States v. Evans*, 75 M.J. 302, 305 (C.A.A.F. 2016).

[62] *Miranda*, 384 U.S. at 444. *See also Yarborough v. Alvarado*, 541 U.S. 652, 661, (2004); Mil. R. Evid. 305(b)(3).

[63] *Alvarado*, 541 U.S. at 662 (citing *McCarty*, 468 U.S. at 434).

as a suspect's freedom of action is curtailed to 'a degree associated with formal arrest.'"[64] "[T]he only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his [or her] situation."[65]

Factors to consider in evaluating whether a person is restrained, thus triggering *Miranda* warnings, include: "(1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place in which questioning occurred[;] and (3) the length of questioning."[66] Another factor is if the suspect is either advised that the interview is voluntary, or is informed that he is free to leave anytime.[67] Federal courts generally consider this last factor—if a suspect is told he or she is free to leave—especially important.[68] "Informing a suspect that he is not under arrest, even without explicitly telling him he is free to leave would also suggest to a reasonable person that he is free to leave."[69]

In applying the above factors to Appellant's case, the first two factors weigh in favor of neither Appellant nor the Government. HSI agents went to Appellant's residence early in the morning. Some of the agents were in tactical gear with weapons drawn. Appellant answered the door dressed only in boxer

---

[64] *McCarty,* 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, (1983) (per curiam)). *See Stansbury v. California*, 511 U.S. 318, 322, (1994) ("In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (quoting *Beheler,* 462 U.S. at 1125); *Oregon v. Mathiason*, 429 U.S. 492, 495, (1977) (per curiam)); *United States v. Schake*, 30 M.J. 314, 318 (C.M.A. 1990)).

[65] *Id*. at 442.

[66] *United States v. Evans*, 75 M.J. 302, 306 (C.A.A.F. 2016) (quoting *Chatfield*, 67 M.J. at 438).

[67] *United States v. White*, No. ARMY 20170147, 2019 CCA LEXIS 110 at *21 (Army Ct. Crim. App. Mar. 8, 2019) (unpublished) (finding an interview was non-custodial when appellant was twice advised, and acknowledged, that the interview was voluntary and he was free to leave at any time).

[68] *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) ("[U]nambiguously advising a defendant that he is free to leave and is not in custody is a powerful fact in the mix, and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.") (cleaned up).

[69] *United States v. Coulter*, 41 F.4th 451, 461 (5th Cir. 2022) (internal quotations omitted).

shorts.[70] Appellant was prohibited from entering his house while the search warrant was being executed. Appellant only had access to items in his house through the HSI agents, who willingly provided items when requested.

However, Appellant was informed he was not under arrest and was not placed in any restraints. Appellant agreed to speak with HSI agents in an unmarked vehicle as a "matter of privacy from neighbors." He sat in the front passenger side seat with the doors unlocked. Appellant was not patted down, searched, or frisked before entering the vehicle. The interview atmosphere and the way it was conducted was cordial and was stress-free aside from its topic being Appellant's criminal conduct. The trial transcript and the audio recording of the interview reveal individuals engaged in ordinary conversation. The HSI agents did not raise their voices, threaten Appellant, or engage in conduct that could fairly be characterized as overbearing or coercive.

Additional factors that favor the Government include: (1) the interview in the vehicle lasted less than an hour; and (2) Appellant was expressly informed he was not under arrest. The HSI agent told Appellant early into the interview, "I'm telling you right now you're not under arrest right now."[71] While that statement falls somewhat short of the unambiguous "you are free to go at any time,"[72] considering the totality of the circumstances surrounding Appellant's interview, we find that a reasonable person in Appellant's position would have believed he was free to leave.

Appellant was being questioned by HSI agents and was not in custody; *Miranda* warnings were therefore not required. The military judge did not abuse his discretion by denying Appellant's suppression motion on that basis.

## C. HSI agents were not required to read Article 31(b) warnings.

We next turn to whether Appellant, notwithstanding the non-custodial nature of the interview in the car, was entitled to be advised of his Article 31(b), UCMJ, rights. We hold he was not.

---

[70] Appellant incorrectly asserts that the military judge failed to consider several important facts because he did not specifically address them in his written ruling. Appellant's Br. at 16-20. However, the military judge stated he, "considered the briefs, supporting evidence, argument from counsel, and applicable law" in his written decision, App. Ex. LXXXVI at 1, which includes the Appellant's state of undress, his access to his possessions in the house, and the armed HSI agents. Specifically, we have reviewed the military judge's findings of fact and conclude that they are supported by the record and not clearly erroneous.

[71] Pros. Ex. 2 at 3.

[72] *White*, 2019 CCA LEXIS 110 at *13.

Article 31(b), UCMJ states:

> No person subject to this chapter may interrogate, or request
> any statement, from an accused or person suspected of an of-
> fense without first informing him of the nature of the accusation
> and advising him that he does not have to make any statement
> regarding the offense of which he is accused or suspected and
> that any statement made by him may be used as evidence
> against him in a trial by court-martial.

Except in limited circumstances, the obligation to advise a military suspect
of his Article 31(b) rights does not extend to civilian law enforcement personnel
who do not work for the military.[73] Civilian law enforcement authorities need
only comply with "the principles of law generally recognized in the trial of crim-
inal cases in the United States district courts involving similar interroga-
tions."[74]

Civilian law enforcement officials are required to advise a suspect of Article
31(b), UCMJ, rights only in two situations: "(1) [w]hen the scope and character
of the cooperative efforts demonstrate that the two investigations merged into
an indivisible entity, and (2) when the civilian investigator acts in furtherance
of any military investigation, or in any sense as an instrument of the mili-
tary."[75] More than a cooperative relationship between civilian and military au-
thorities is required before civilian authorities will be required to provide Ar-
ticle 31(b), UCMJ, warnings.[76]

Appellant argues that the two investigative agencies merged into an indi-
visible entity by the time the search warrant was executed. Appellant also ar-
gues that HSI agents acted in furtherance of the military investigation and
thereby became an instrument of the military.[77] But the facts before us say

---

[73] *United States v. Grisham*, 4 C.M.A. 694, 697, 16 C.M.R. 268, 271 (C.M.A. 1954).

[74] Mil. R. Evid 305(f)(1).

[75] *United States v. Redd*, 67 M.J. 581, 586 (Army Ct. Crim. App. 2008) (quoting
*United States v. Rodriguez*, 60 M.J. 239, 251 (C.A.A.F. 2004)) (internal quotation
marks and further citations omitted). *See also United States v. Penn*, 18 C.M.A. 194,
199, 39 C.M.R. 194, 199 (C.M.A. 1969); *United States v. Quillen,* 27 M.J. 312, 314
(C.M.A. 1988).

[76] *United States v. Payne*, 47 M.J. 37, 43 (C.A.A.F. 1997); *Rodriguez,* 60 M.J. at
251-55 (noting military surveillance support to civilian federal agents over a five-day
period did not transform a civilian investigation into a joint investigation requiring
civilian agents to provide Article 31(b) warnings).

[77] Appellant's Br. at 20-21.

otherwise and we concur with the trial judge who found, "HSI was not acting in furtherance of any military investigation or as an indivisible entity, eliminating a requirement for Article 31(b) rights advisement."[78]

When Special Agents Baker and Peters interviewed Appellant, no military authority was actively investigating the allegations beyond providing limited support to HSI agents efforts. NCIS agents only documented the existence of an investigation of Appellant the day before the search and released their Report of Investigation 8 days after the search stating, "[t]his investigation is being worked jointly with the Department of Homeland Security, [HSI]; HSI maintains primary jurisdiction."[79] The only military investigative activities prior to the day of Appellant's interview were limited support to HSI agents efforts in: (1) providing assistance in identifying Appellant; (2) providing photos of Appellant's house for the search warrant application; and (3) providing surveillance of Appellant's house before the search. NCIS agents did not give guidance or advice to the HSI agents about this case before their conversation with Appellant in the Jeep Cherokee. The HSI agents were not employed by, or otherwise subordinate to, military authorities. The HSI agents did not act at the behest of military authorities and had independent authority to investigate the federal crimes at issue.

In *United States v. Lonetree*, the Court of Military Appeals considered an analogous circumstance. The *Lonetree* Court concluded that those civilian investigators, although cooperating and coordinating closely with the Naval Investigative Service, were "not subject to the UCMJ" and were "conducting an independent investigation without serving as an instrument of the military . . . ." Therefore, they "had no obligation to give Lonetree an Article 31 warning prior to their meetings with him."[80]

The Court of Military Appeals reached the same conclusion in *United States v. Penn*: "civilian investigators, acting entirely independent of military authority, need not, as persons not subject to the [UCMJ], preliminarily advise an accused of his rights under Article 31."[81]

---

[78] App. Ex. LXXXVI at 9.

[79] App. Ex. XLV, Encl. D.

[80] *United States v. Lonetree*, 35 M.J. 396, 405 (C.M.A. 1992), *cert. denied*, 507 U.S. 1017 (1993).

[81] *Penn*, 16 C.M.A. 198-99, 39 C.M.R. at 198-99 (holding that merely because the Secret Service had asked for Air Force Office of Special Investigations' assistance in conducting the investigation did not require the Secret Service Agent to give Article 31 warnings) (citation omitted).

In this case, the military judge did not abuse his discretion by declining to suppress Appellant's statements to the HSI agents. Appellant was not entitled to be informed of either *Miranda* or Article 31(b), UCMJ, rights prior to HSI agents interviewing him because he was not in custody, and because HSI was not acting as an instrument of the military.

**D. The subsequent statement to the NCIS agent was not involuntary. No cleansing warning was required.**

An appellant's involuntary statement is inadmissible at trial.[82] Statements are deemed involuntary if obtained "in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31(b), or through coercion, unlawful influence, or unlawful inducement."[83] As the Defense made an appropriate motion to preclude the admission of Appellant's statement at trial, the Government bore the burden of establishing the voluntariness of the statement by a preponderance of the evidence.[84] Voluntariness turns on whether an appellant's "will has been overborne."[85] In the course of our review, "[t]he necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker."[86]

Courts assess voluntariness based on the totality of the circumstances, including "both the characteristics of [an appellant] and the details of the interrogation."[87] Courts look to the condition of the appellant, including his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.[88] The voluntariness determination seldom turns on

---

[82] Mil. R. Evid. 304(a).

[83] Mil. R. Evid. 304(a)(1)(A).

[84] Mil. R. Evid. 304(f)(6)-(7); *Missouri v. Seibert*, 542 U.S. 604 (2004).

[85] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

[86] *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996).

[87] *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (quoting *Bustamonte*, 412 U.S. at 218).

[88] *United States v. Ellis* 57 M.J. 375, 379 (C.A.A.F. 2002).

one factor alone, and the weight given to each factor depends on the circumstances and the appellant's state of mind.[89]

In his brief, Appellant argues that the Supreme Court's decision in *Seibert* applies to the facts of this case as a type of deliberate "two-step interrogation" method designed to evade rights advisement requirements. Therefore, according to Appellant, his statement to the NCIS agent after waiving his Article 31(b) rights was tainted by the earlier unlawful custodial interrogation by HSI agents.[90] Where an earlier statement is "involuntary" only because the accused was not properly warned of his Article 31(b), UCMJ, rights, the voluntariness of the second statement is determined by the totality of the circumstances.[91] The earlier unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent statement.[92] If a "cleansing warning" has been given—where the accused is advised that a previous statement cannot be used against him—that statement should be considered.[93] If a cleansing statement is not given, however, its absence is not fatal to a finding of voluntariness.[94]

Like *Brisbane*, the evidence in this case does not support a conclusion that HSI and NCIS agents engaged in a purposeful plan to evade Appellant's rights. Further, although there was coordination between HSI and NCIS agents, the record does not demonstrate a deliberate effort aimed at securing an unwarned confession for later use in securing a warned confession.

"*Seibert* does not ban coordination among individuals. Rather, it is aimed at a very specific, deliberate practice of successive interrogations to secure an admissible confession."[95] Because the evidence in this case does not support a conclusion that HSI and NCIS agents engaged in the type of unconstitutional practice prohibited by *Seibert*, the test for whether the second confession is admissible is whether it was voluntary under the circumstances.[96]

---

[89] *United States v. Jones*, 34 M.J. 899, 906 (N.M.C.M.R. 1992) (citing *Bustamonte*, 412 U.S. at 226).

[90] Appellant's Br. at 24-29.

[91] *United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F. 2006).

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.* at 115.

[96] *United States v. Cuento,* 60 M.J. 106, 109 (C.A.A.F. 2004).

Although Appellant's interview with NCIS was less than a few hours after his interview with HSI agents, he was provided and waived his Article 31(b), UCMJ, rights and consented to the polygraph in writing. Appellant was a 25-year-old sergeant with over eight years in the Marine Corps.[97] He has a high school education and scored 95 on the Armed Forces Classification Test.[98] And the conditions of Appellant's second interview were not coercive. There is nothing to suggest that Appellant's free will was overborne.

We find that Appellant's statement to the NCIS agent was voluntary under the circumstances and not barred by the Supreme Court's decision in *Seibert*, notwithstanding the absence of a cleansing warning. Thus, the military judge did not abuse his discretion in admitting Appellant's statements or the evidence subsequently seized from him.

---

[97] Pros. Ex. 6 at 1.

[98] Pros. Ex. 6 at 5.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[99]

The Entry of Judgment does not accurately reflect the disposition of the charges, in accordance with R.C.M. 1111(c)(2), as it fails to state the complete date range in the Findings of the Charge and reflect the correct Article of the UCMJ in the Findings of Second Additional Charge I. Specifically, we note that Block 11 incorrectly does not include the year "2021" as to the sole specification of the Charge, and states Article 134 instead of Article 120b for Second Additional Charge I. Therefore, we modify the Entry of Judgment and direct that it be included in the record. Although we find no prejudice from this error, Appellant is entitled to courts-martial records that correctly reflect the content of his proceedings.[100]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[99] Articles 59 & 66, UCMJ.

[100] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998); *United States v. Sutton*, 81 M.J. 677 (N-M. Ct. Crim. App. 2021).

# United States Navy–Marine Corps Court of Criminal Appeals

| | |
|---|---|
| **UNITED STATES** | **NMCCA NO. 202200263** |
| v. | **ENTRY OF JUDGMENT** |
| **Austin M. CUNNINGHAM**<br>Sergeant (E-5)<br>U.S. Marine Corps<br>*Accused* | *As Modified on Appeal*<br><br>**8 May 2024** |

On 24 August 2022, the Accused was tried at Marine Corps Base Camp Lejeune, North Carolina, by general court-martial consisting of a military judge sitting alone. Military Judge Nicholas S. Henry presided.

## FINDINGS

The following are the Accused's pleas and the Court's finding to all offenses the convening authority referred to trial:

**Charge:** **Violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.**

    *Plea:* Guilty.
    *Finding:* Guilty.

**Specification:** **On or about 12 April 2021, on divers occasions, knowingly and wrongfully distribute child pornography, to wit: videos of minors engaging in sexually explicit conduct, and that said conduct was of a nature to bring discredit upon the armed forces.**

    *Plea:* Guilty, except the words, "on or about 12 April 2021" and substituting the language, "between on or about 5 April 2021 and on or about 12 April 2021."
    *Finding:* Guilty.

**Additional Charge I:**      **Violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.**

> *Plea:* Guilty.
>
> *Finding:* Guilty.

**Specification 1:**    **On or about 5 April 2021, knowingly and wrongfully distribute child pornography, to wit: a video of a minor engaging in sexually explicit conduct, and that said conduct was of a nature to bring discredit upon the armed forces.**

> *Plea:* Not Guilty.
>
> *Finding:* Withdrawn and dismissed without prejudice to ripen into prejudice upon completion of appellate review.

**Specification 2:**    **On or about 11 April 2021, knowingly and wrongfully produce child pornography, to wit: a video of a minor engaging in sexually explicit conduct, and that said conduct was of a nature to bring discredit upon the armed forces.**

> *Plea:* Guilty.
>
> *Finding:* Guilty.

**Specification 3:**    **On or about 4 May 2021, knowingly and wrongfully possess child pornography on a personal cellular phone, to wit: images and videos of a minor engaging in sexually explicit conduct, and that said conduct was a nature to bring discredit upon the armed forces.**

> *Plea:* Guilty.
>
> *Finding:* Guilty.

**Specification 4:**    **On divers occasions, between on or about 1 March 2021 and on or about 4 May 2021, knowingly and wrongfully view child pornography on a personal cellular phone, to wit: images and videos of a minor engaging in sexually explicit conduct, and that said conduct was of a nature to bring discredit upon the armed forces.**

> *Plea:* Guilty.
>
> *Finding:* Guilty.

**Specification 5:**    **Did, on or about 6 April 2021, engage in a sexual act with a certain animal, to wit: by causing contact between Sgt Cunningham's penis and the mouth of a**

> **dog, and that said conduct was of a nature to bring
> discredit upon the armed forces.**

> *Plea:* Not Guilty.

> *Finding:* Withdrawn and dismissed without prejudice to
> ripen into prejudice upon completion of appellate review.

Specification 6: **Did, on or about 6 April 2021, for the purpose of
producing and disseminating an obscene film,
knowingly filmed himself engaging in a sexual act
with an animal, in violation of N.C.G.S. 14-190.5, as
assimilated by Title 18 U.S.C. Sec 13, an offense not
capital.**

> *Plea:* Not Guilty.

> *Finding:* Withdrawn and dismissed without prejudice to
> ripen into prejudice upon completion of appellate review.

**Additional Charge II:      Violation of Article 120b, Uniform Code of
Military Justice, 10 U.S.C. § 920b.**

> *Plea:* Guilty.

> *Finding:* Guilty.

Specification: **on or about 11 April 2021, commit a sexual act upon
D.F. a child who had not attained the age of 12 years,
by causing contact between Sgt Cunningham's mouth
and D.F.'s penis, with the intent to gratify the sexual
desires of Sgt Cunningham.**

> *Plea:* Guilty.

> *Finding:* Guilty.

**Additional Charge III:      Violation of Article 80, Uniform Code of Military
Justice, 10 U.S.C. § 880.**

> *Plea:* Not Guilty.

> *Finding:* Withdrawn and dismissed without prejudice to
> ripen into prejudice upon completion of appellate review.

Specification: **Having knowledge of a lawful order issued by LtCol R.
L. Nickel, U.S. Marine Corps, to wit: Military
Protective Order dated 20210505, an order which it
was his duty to obey, did, on divers occasions, between
on or about 5 May 2021 and 4 June 2021, attempt to
violate the same.**

> *Plea:* Not Guilty.

> *Finding:* Withdrawn and dismissed without prejudice to

ripen into prejudice upon completion of appellate review.

**Second Additional Charge I:      Violation of Article 120b, Uniform Code of Military Justice, 10 U.S.C. § 920b.**

*Plea:* Guilty.

*Finding:* Guilty.

Specification:      **Did, on or about 6 April 2021, commit a lewd act upon G.C., a child who had not attained the age 16 years, by engaging in indecent conduct, to wit: masturbation, intentionally done in the presence of said child, which conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.**

*Plea:* Guilty.

*Finding:* Guilty.

**Second Additional Charge II:     Violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed without prejudice to ripen into prejudice upon completion of appellate review.

Specification:      **Did, on or about 11 April 2021, knowingly and wrongfully distribute child pornography, to wit: a video of a minor, engaging in sexually explicit conduct, and that said conduct was of a nature to bring discredit upon the armed forces.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed without prejudice to ripen into prejudice upon completion of appellate review.

## SENTENCE

On 24 August 2022, the military judge sentenced the Accused to the following:

**Reduction to E-1**.

**Confinement for a total of 21 years, as follows:**

*For Specification of Charge I:*
confinement for 3 years.

*For Specification 2 of Additional Charge I:*
confinement for 4.5 years.

*For Specification 3 of Additional Charge I:*
confinement for 2 years.

*For Specification 4 of Additional Charge I:*
confinement for 1.5 years.

*For Specification of Additional Charge II:*
confinement for 7 years.

*For Specification of Second Additional Charge I:*
confinement for 3 years.

The terms of confinement will run consecutively.

The Accused has served 477 days of pretrial confinement and shall be credited with 477 days of confinement already served, to be deducted from the adjudged sentence to confinement.

**Forfeiture of all pay and allowances.**

**A dishonorable discharge.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court